United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CASSAUNDRA ELLENA,<br><br>    Plaintiff,<br><br>    v.<br><br>STANDARD INSURANCE COMPANY, et al.<br><br>    Defendants. | Case No. 12-5401 SC<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR <u>SUMMARY JUDGMENT</u> |

## I. INTRODUCTION

After her doctors diagnosed her with lupus, Cassaundra Ellena ("Plaintiff") filed a claim for disability benefits with Standard Insurance Company ("Defendant"). This case arises out Defendant's denial of that claim. Plaintiff's Second Amended Complaint ("2AC"), the operative pleading in this matter, asserts causes of action against Defendant for breach of contract, breach of the covenant of good faith and fair dealing ("bad faith"), intentional misrepresentation, negligent misrepresentation, and intentional infliction of emotional distress ("IIED").[1] Defendant now moves

---

[1] The 2AC is currently buried in an undifferentiated mass of more than one thousand pages of documents filed in connection with

1 for summary judgment on all of these causes of action, with the
2 exception of Plaintiff's breach of contract claim.  ECF No. 58
3 ("MSJ").  Defendant also moves for summary judgment on Plaintiff's
4 prayer for punitive damages.  The motion is fully briefed, ECF Nos.
5 70 ("Opp'n") (filed under seal), 76 ("Reply"), and appropriate for
6 determination without oral argument per Civil Local Rule 7-1(b).
7 For the reasons set forth below, the motion is GRANTED in part and
8 DENIED in part.

## II. BACKGROUND

Plaintiff was employed by Sonoma County (the "County") between December 31, 2008 and April 16, 2010.  At the time Plaintiff resigned her position with the County, her title was "Redevelopment Manager" and her job duties included planning and implementing public works projects.  ECF No. 60 ("Eisele Decl.") Exs. 3, 4.  As part of her employment, Plaintiff was covered by a group long-term disability insurance policy issued by Defendant.  ECF No. 60 ("Eisele Decl.") Ex. 1 (the "Policy").  The Policy provides for "own occupation" coverage for the first twenty-four months of disability, and "any occupation" coverage thereafter.  Id. at 596.

Own occupation coverage protects Plaintiff against disability that renders her "unable to perform with reasonable continuity the Material duties of [her] Own Occupation."  Id. at 601.  The Policy defines "own occupation" as:

> [A]ny employment, business, trade, profession, calling
> or vocation that involves the same general character
> as the occupation you are regularly performing for

---

Defendant's notice of removal.  See ECF No. 6 ("Vanna Decl. Part 2 of 4") at 57-83 ("2AC").

2

> your Employer when Disability begins. In determining your Own Occupation, we are not limited to looking at the way you perform your job for your Employer, but we may also look at the way the occupation is generally performed in the national economy.

Id. The Policy defines "material duties" as:

> [T]he essential tasks, functions, and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted. In no event will we consider working an average of more than 40 hours per week to be a Material Duty.

Id.[2]

Plaintiff applied for own occupation coverage under the Policy a few days after she left her job with the County in April 2010. Eisele Decl. Ex. 2. Her claim states that she was unable to work due to "Lupus - Systemic Lupus Erythematosus." Id. at 481. According to medical records submitted in connection with Plaintiff's claim, she had been dealing with lupus since at least 2007. Plaintiff was hospitalized for two days in June 2008 with chest pain, myalgias, and fever. Eisele Decl. Ex. 9 at 335-36. The treating physician, Dr. Steven Orkand, observed that Plaintiff's condition improved after she began taking a medication known as prednisone. Id. at 336.

After her hospitalization, Plaintiff continued to see a rheumatologist, Dr. Richard Zweig, concerning her condition. See Eisele Decl. Ex. 12-14. Plaintiff saw Dr. Zweig at least four times before quitting her job on April 16, 2010: February 13, 2009,

---

[2] In connection with the instant motion, neither party raises any issues regarding the Policy's definition of "any occupation."

July 10, 2009, August 17, 2009, and April 14, 2010.  Id.  In a progress note concerning Plaintiff's last visit, Dr. Zweig stated:

> [Plaintiff's] attacks of systemic lupus erythematosus have been coming more frequently so that she has them now more than she doesn't.  She gets fevers, chest pains, shortness of breath, myalgias and arthralgias.  She thinks they are triggered by stress at work.  She often works 10-12 hour days.  She increases her prednisone to 10 to 20 mg for a few days and tapers.  She has had no prednisone for the past two weeks and says that rest and exercise are just as effective in curtailing her attacks as prednisone is.  She wants to go on disability to see if this is a long term solution.  She is not unwilling to take more medications, but would prefer not to if she can control her symptoms with rest.

Eisele Decl. Ex. 14.  On May 5, 2010, Dr. Zweig submitted an attending physician statement in support of Plaintiff's claim for disability benefits, in which he stated that he anticipated Plaintiff could return to work at the end of the year.  Eisele Decl. Ex. 5.

Defendant subsequently retained another rheumatologist, Dr. Shirley Ingram, to review Plaintiff's medical records.  Eisele Decl. Ex. 15.  Based on that review, Dr. Ingram concluded that Plaintiff had "mild systemic lupus erythematosus, with several occasions of chest pain attributed to pericarditis . . . , but her symptoms do respond to prednisone."  Id. at 154.  Dr. Ingram also concluded that "it is reasonable that Plaintiff is able to work eight-hour days, 40 hours per week with consistency," and that it was "[Plaintiff's] decision to cease work in hopes she can avoid taking her low-dose routine lupus medication."  Id. at 155.  Dr. Ingram's conclusions remained unchanged after she spoke with Dr. Zweig on July 30, 2010.  Eisele Decl. Ex. 16.

4

Defendant also obtained a vocational review conducted by Laura Willis. Eisele Decl. ¶ 20. Willis described the "strength demands" of Plaintiff's job as "sedentary." Eisele Decl. Ex. 6. According to Willis's report, "[s]edentary work involves sitting most of the time, but may involve walking or standing for brief periods of time." Id. Willis concluded that the job required Plaintiff to "exert force to 10 lbs. occasionally, or a negligible amount of force frequently," as well as occasional "fingering" (e.g., typing) and "handling" but did not require "climbing," "balancing," "stooping," or "kneeling." Id. Willis described Plaintiff's position as "project manager." She described Plaintiff's job duties in a manner that was generally consistent with the job description provided by the County. Compare id. with Eisele Decl. Ex. 4. Willis categorized Plaintiff's position as "project director," and listed a number of "alternate job titles," including "amphibious warfare research officer" and "dental sciences and research officer." See Eisele Decl. Ex. 6.

Defendant denied Plaintiff's claim for disability benefits on August 27, 2010. Eisele Decl. Ex. 19. In its denial letter, Defendant explained that Plaintiff's symptoms "ha[d] been controlled with persistent low-dose prednisone," and that Plaintiff's claim that her physician advised that she cease work was inconsistent with information provided by Dr. Zweig. Id. at 33. Defendant concluded that, although Plaintiff may occasionally have limitations or restrictions when suffering from lupus flares, her symptoms were not of such severity or frequency as to preclude her from performing her sedentary occupation. Id.
///

Plaintiff appealed the denial. Though she conceded that most of her job duties were sedentary, Plaintiff claimed that her job required constant typing, and that long hours at a desk aggravated the pain in her neck, fingers, hands, back, and shoulders. Eisele Decl. Ex. 20. She complained that Defendant did not consider the non-physical requirements of her position, which created stress and were key triggers to her lupus flares. Id. Plaintiff also disputed that her symptoms could be controlled by prednisone, claiming that she would experience the same symptomatic flares, regardless of whether she increased or decreased her dosage or did not take prednisone at all, and that the prednisone contributed to depression and osteoporosis. Id. Additionally, Plaintiff claimed that her job duties sometimes included strenuous physical activity, specifically setting up tables, chairs, and PA equipment for bi-monthly meetings. Id.

In connection with her appeal, Plaintiff submitted a letter from Dr. Zweig, dated September 7, 2010, stating that Plaintiff's pain attacks were now occurring monthly and showing no signs of abating. Eisele Decl. Ex. 21. Dr. Zweig predicted that those attacks were now permanent. Id. Plaintiff also submitted a letter from another rheumatologist, Dr. Thomas H. Garrett. Eisele Decl. Ex. 24. After reviewing Plaintiff's symptoms and her job duties, Dr. Garrett concluded that Plaintiff was permanently unable to fulfill her current job duties. Id.

In evaluating Plaintiff's appeal, Defendant hired another physician, Dr. Theodore Kleikamp, to review Plaintiff's medical records. Eisele Decl. Ex. 27. Dr. Kleikamp concluded that, notwithstanding Plaintiff's reports of physical discomfort, her

physical exam findings and laboratory work did not indicate lupus of sufficient severity to preclude her from full-time sedentary work. Id. at 110. He also stated that Plaintiff had shown improvement from the use of prednisone and that other medications were available to treat Plaintiff's symptoms. Id.

Defendant also retained another vocational manager, Steve Cooper, to review Plaintiff's file in connection with her appeal. Eisele Decl. Ex. 28. Cooper stated it was possible that Plaintiff's job involved setting up tables, chairs, and equipment, and that it was not uncommon for directors at her level to be involved in such physical work, but that these tasks were not part of her written job description and were not material duties of her occupation. Id. Based on his vocational research and on Plaintiff's job description, Cooper also opined that Plaintiff's position did not required constant typing. Id.

After reviewing this and other information, Defendant upheld its denial of benefits on November 18, 2010. Eisele Decl. Ex. 29. Defendant subsequently reviewed another memo from Dr. Garrett, opining that that Plaintiff's elevated ESR[3] results demonstrated significant inflammation, and that this and other new information indicated that Plaintiff was permanently incapacitated. Eisele Decl. Ex. 30. Defendant also consulted Bradley Fancher, a doctor of internal medicine, who disagreed with Dr. Garrett's characterization of the ESR result. Eisele Decl. Ex. 30. After reviewing this information, Defendant again stood by its decision. Eisele Decl. Ex. 37.

---

[3] ESR stands for "erythrocyte sedimentation rate," a measure of inflammation in the body.

1  Plaintiff filed this action in state court in November 2011.
2  ECF No. 1.  After non-diverse parties were dismissed from the case,
3  Defendant removed to federal court.  Id.  In here SAC, Plaintiff
4  asserts causes of action against Defendant for (1) breach of
5  contract, (2) bad faith, (3) intentional misrepresentation, (4)
6  negligent misrepresentation, and (5) IIED.  Defendant now moves for
7  summary judgment on claims two through five.

**III. LEGAL STANDARD**

Entry of summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment should be granted if the evidence would require a directed verdict for the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).  "A moving party without the ultimate burden of persuasion at trial -- usually, but not always, a defendant -- has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment."  Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

"In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  Id.  "In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact."  Id.

## IV. DISCUSSION

### A. Evidentiary Issues

In connection with it motion for summary judgment, Defendant has submitted a number of documents that were not available to or reviewed by Defendant before it rendered a decision on Plaintiff's claim for disability benefits. See, e.g., ECF No. 59 ("Vana Decl.") Exs. 2-9. Plaintiff objects to this evidence. That objection is SUSTAINED. As discussed below, to succeed on its claim for bad faith, Plaintiff must show that Defendant's denial of her claim for disability benefits was unreasonable. See Adams v. Allstate Ins. Co., 187 F. Supp. 2d 1207, 1214 (C.D. Cal. 2002). In assessing reasonableness, the insurer's decisions are considered at the time they were made, "not with the benefit of hindsight." Id. Thus, any new information that came to light after Defendant decided to deny Plaintiff's claim is irrelevant to the reasonableness of Defendant's decision. In any event, the objectionable evidence would not change the Court's determination regarding summary adjudication of Plaintiff's claims.

Some of the evidence relied on by Plaintiff is also inadmissible. For example, Plaintiff's opposition brief cites heavily from the declaration of Steven Prater, a purported insurance expert, which offers a series of legal conclusions concerning Defendant's conduct. At one point, Prater goes so far as to argue that Defendant's definition of "disability" is contrary to cases decided by the California Supreme Court and Court of Appeal. These opinions clearly violate the prohibition on expert witnesses offering legal conclusions, Elsayed Mukhtar v. Cal. State Univ., 299 F.3d 1053, 1064 n.8 (9th Cir. 2002), and the Court does

9

not rely on them.

The parties raise a number of other objections concerning evidence that the Court need not consider in adjudicating the instant motion. Accordingly, the Court declines to rule on those objections.

**B.     Bad Faith**

To prevail on a claim for bad faith in the insurance context, the insured must show that the insurer erroneously failed to pay benefits under an insurance policy, and that failure to do so was without proper cause. Id. "[T]he ultimate test of [bad faith] liability in [insurance] cases is whether the [insurer's] refusal to pay policy benefits was unreasonable." Austero v. Nat'l Cas. Co., 84 Cal. App. 3d 1, 32 (Cal. Ct. App. 1978) overruled on other grounds by Egan v. Mut. of Omaha Ins. Co., 24 Cal. 3d 809, 620 (Cal. 1979).

Plaintiff asserts that Defendant's decision to deny her claim was unreasonable for two reasons: (1) Defendant's definition of disability is contrary to California law; (2) Defendant failed to properly consider the severity of Plaintiff's condition, the demands of her own occupation, and the statements of her treating physicians. Defendant argues that the first theory fails because the Policy definitions are consistent with California law, and that the second theory fails because there is a genuine dispute concerning Plaintiff's condition. The Court considers each theory below.

**i.     Definition of Disability**

Plaintiff argues that the Policy's definition of "own occupation" disability is contrary to California law, specifically

Erreca v. Western States Life Insurance Company, 19 Cal. 2d 388 (Cal. 1942), and Moore v. American United Life Insurance Company, 150 Cal. App. 3d 610 (Cal. Ct. App. 1984). Opp'n at 10. The Policy defines "own occupation" to mean any employment that involves material duties of the same general character as Plaintiff's own occupation at the time of her alleged disability. Plaintiff contends this definition is a blatant violation of California law, since Defendant should be limited to considering whether she can perform the substantial and material acts necessary to pursue her usual occupation in the usual or customary way. Id. at 8.

As Plaintiff points out, there is a distinction between "own occupation" coverage, which indemnifies against disability that renders an insured unable to perform his or her own occupation, and "any occupation" coverage, which indemnifies against disability that renders the insured unable to perform any occupation. The instant dispute concerns the former type of coverage, sometimes referred to as "occupational coverage," which is broader and generally more expensive.

The case law cited by Plaintiff deals with the latter type of coverage, sometimes referred to as non-occupational coverage. The policy at issue in Erreca only provided coverage upon a "total disability" that prevented the insured "from engaging in any occupation, or performing any work whatsoever for remuneration or profit." Id. at 395 (emphasis added). Nevertheless, the court found that the insured, who was employed as a farm supervisor prior to his disability, was totally disabled under the policy if "he [was] no longer able to pursue the occupation of farmer or farm

1  supervisor." Id. The court reasoned that the insured "had little
2  formal education and is neither trained nor qualified for any other
3  occupation. And because of his age and experience in life, he
4  probably could not prepare himself for other remunerative
5  employment." Id. The court then stated: "[T]he term 'total
6  disability' does not signify an absolute state of helplessness but
7  means such a disability as renders the insured unable to perform
8  the substantial and material acts necessary to the prosecution of a
9  business or occupation in the usual or customary way." Id. at 396.
10     In Moore, the court found that an insurer had run afoul of
11 Erreca by drafting its definition of "total disability" too
12 narrowly. 150 Cal. App. 3d at 620. Like Erreca, Moore dealt with
13 non-occupational coverage. Id. The court upheld the trial court's
14 jury instruction on the definition of total disability, which
15 tracked the language from Erreca, rather than the policy language.
16 Id. at 632-33. The court also declined to set aside the jury's
17 punitive damage award, reasoning that "lay persons would be
18 unlikely to know that they had an established right under
19 California law to have coverage determined using the broader Erreca
20 standard rather than the explicit language of defendant's policy."
21 Id. at 637-38.
22     Together, Erreca and Moore clearly establish a floor for non-
23 occupational coverage in California and require courts to deviate
24 from the policy language when insurers define "total disability"
25 too narrowly. Plaintiff argues that these cases also clearly
26 establish a separate, higher floor for occupational coverage, and
27 that Defendant should be held liable for bad faith because the
28 Policy falls below that floor. Specifically, Plaintiff argues that

12

1   Moore and Erreca mandate that, for the purposes of occupational
2   coverage, disability must be defined as "disability that renders
3   one unable to perform with reasonable continuity the substantial
4   and material acts necessary to pursue his usual occupation in the
5   usual or customary way."  Opp'n at 8 (quoting Moore, 150 Cal. App.
6   at 631).

7   　　　There are at least two problems with this line of argument.
8   First, California law does not require insurers to quote the exact
9   language from Erreca and Moore when defining disability.  See
10  Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1007
11  (9th Cir. 2004) ("[F]or all practical purposes there is no
12  difference between Erreca's use of the phrase 'substantial and
13  material duties' and the policy's use of the phrase 'important
14  duties.").  Rather, it is the insurer's application of the
15  definition that matters.  Here, Plaintiff argues that Defendant
16  used its definition of disability to "hypothesize a fictional,
17  generic occupation for [Plaintiff]."  Opp'n at 11.  But the
18  evidence cited by Plaintiff does not bear this out.  The job
19  description contained in Defendant's vocational report is generally
20  consistent with Plaintiff's professional duties with the County.
21  Plaintiff makes much of the fact that Defendant's vocational report
22  identifies Plaintiff as a "project director" and lists alternative
23  job titles, such as "amphibious warfare research officer," which
24  bear little resemblance to Plaintiff's actual job.  Id.  However,
25  Plaintiff has presented no evidence that Defendant evaluated her
26  claim based on this list of alternative job titles.  Further, it is
27  unclear what these alternative job titles actually represent.
28  ///

13

The second problem with Plaintiff's theory is that the case law dealing with the definition of "own occupation" disability does not expressly preclude the language used by Defendant. Erreca and Moore do not directly address the issue because they dealt with non-occupational coverage. Other California cases have found that Erreca's definition of total disability applies to both occupational and non-occupational coverage. See Austero, 84 Cal. App. 3d at 20; see also Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1006 (9th Cir. 2004) (citing Austero). However, none of these courts addressed the policy language at issue in this case, which ostensibly allows the insurer to consider the insured's ability to perform other employment that involves the same general character as the occupation of the insured, and thus these courts did not have an opportunity to declare that such language runs afoul of Erreca. For example, the policy at issue in Hangarter defined total disability to mean that the insured was unable to perform the "important duties of your Occupation." 373 F.3d at 1006. Similarly, the policy in Austero defined total disability in the context of a disability that "prevent[ed] the Member from performing any and every duty pertaining to his occupation or profession." 84 Cal. App. 3d at 5. Absent some clear statement from the California courts that Defendant's definition is wrong, the Court cannot find that Defendant's use of that definition constitutes bad faith. See Filippo Indus., Inc. v. Sun Ins. Co. of New York, 74 Cal. App. 4th 1429, 1438-39 (Cal. Ct. App. 1999) (courts may not impose bad faith liability where there is a genuine issue as to the insurer's underlying liability created by uncertainties in the case law).

Accordingly, the Court renders summary adjudication in favor of Defendant on Plaintiff's bad faith claim to the extent that the claim is predicated on the theory that Defendant's definition of "own occupation" runs contrary to California law. Nothing in this Order precludes Plaintiff from asserting a definition disability that departs from the language of the Policy in the context of Plaintiff's breach of contract claim.

### ii. Genuine Dispute Doctrine

Defendant argues that the remainder of Plaintiff's bad faith claim should be dismissed under California's genuine dispute doctrine. Under this doctrine, an insurer that denies payment of benefits "due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract." Bosetti v. U.S. Life Ins. Co., 175 Cal. App. 4th 1208, 1237 (Cal. Ct. App. 2009) (quotations omitted). Thus, the doctrine allows an insurer to obtain summary adjudication on an insured's bad faith claim where there is a genuine dispute over coverage. Id. "An insurer cannot claim the benefit of the genuine dispute doctrine based on an investigation or evaluation of the insured's claim that is not full, fair and thorough." Id. "Nor may an insurer 'insulate itself from liability for bad faith conduct by the simple expedient of hiring an expert for the purpose of manufacturing a genuine dispute.'" Id. (quoting Chateau Chamberay Homeowners Ass'n v. Assoc. Int'l Ins. Co., 90 Cal. App. 4th 335, 349 (Cal. Ct. App. 2001)).

///

The Court finds that there exist several triable issues of fact as to whether there was a genuine dispute concerning Plaintiff's entitlement to disability benefits. For example, there are triable issues of fact as to whether Defendant gave sufficient weight to the opinions of Plaintiff's treating physicians, whether Defendant placed too much weight on the opinions of doctors that it hired and paid to review Plaintiff's medical records, whether Defendant unreasonably downplayed Plaintiff's reports of her own symptoms, whether Defendant's consideration of the efficacy and side-effects of prednisone was reasonable, whether Defendant properly considered the cognitive and other non-physical demands of Plaintiff's occupation, and whether Defendant's properly assessed the material duties of Plaintiff's own occupation. All of these issues depend on credibility determinations which the Court cannot make on a motion for summary judgment.

Accordingly, the Court declines to find, as a matter of law, that there is a genuine dispute concerning Plaintiff's eligibility for benefits.

**B. Intentional and Negligent Misrepresentation**

Plaintiff's claims for intentional and negligent misrepresentation are predicated on the novel theory that Defendant deceived the County into purchasing the Policy by falsely representing that (1) the Policy complied with California law, and (2) Defendant would pay disability benefits if an insured was unable to perform his or her own occupation. SAC ¶¶ 20-29.

Under California law, the elements of intentional misrepresentation, also known as fraud, are: "(1) a misrepresentation (false representation, concealment, or

nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." Robinson Helicopter Co., Inc. v. Dana Corp., 34 Cal. 4th 979, 990 (Cal. 2004). The elements of negligent misrepresentation are the same, except that they do not include scienter or intent to defraud. Small v. Fritz Cos., Inc., 30 Cal. 4th 167, 173 (Cal. 2003). Instead, the plaintiff must show that the defendant made a misrepresentation "without any reasonable ground for believing it to be true." Cont'l Airlines, Inc. v. McDonnell Douglas Corp., 216 Cal. App. 3d 388, 402 (Cal. Ct. App. 1989).

Plaintiff's misrepresentation claims fail for a number of reasons. To the extent that Plaintiff can actually bring an action based on misrepresentations made to the County, she has offered no evidence showing that the County's reliance was reasonable. There is no indication that the County was unaware of the terms of the Policy when it agreed to purchase it. Thus, if the Policy is contrary to California law, the County could have discovered the problem through reasonable diligence. Likewise, if the County had wanted a narrower definition of "own occupation," it could have insisted on such a definition during negations with Defendant.[4] Plaintiff's claims fail for the additional reason that Plaintiff has failed to offer any evidence of scienter, or evidence that Defendant had no ground to believe its representations concerning

---

[4] Plaintiff argues that Defendant's promotional materials fail to disclose that the Policy violates California law. Opp'n at 27 (citing Cohen Decl. Ex. N (filed under seal)). However, there is no indication that these promotional materials were the only information conveyed to the County prior to its agreement with Defendant.

17

the Policy were true.  As discussed in Section IV.A.i <u>supra</u>, the law on own occupation disability insurance is not settled, and thus Defendant could have reasonably believed that the Policy complied with California law.  Further, Plaintiff has offered no evidence that Defendant knew how it would apply the Policy's definition of disability at the time of its agreement with the County.

Accordingly, the Court GRANTS Defendant's motion for summary judgment with respect to Plaintiff's claims for intentional and negligent misrepresentation.

**C.   IIED**

To state a claim for intentional infliction of emotional distress ("IIED"), Plaintiff must allege: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." <u>Christensen v. Super. Ct.</u>, 54 Cal. 3d 868, 903 (Cal. 1991) (quotations and citations omitted).  Conduct is only "extreme and outrageous" when it is "so extreme as to exceed all bounds of that usually tolerated in a civilized community." <u>Davidson v. City of Westminster</u>, 32 Cal. 3d 197, 185 (Cal. 1982).

California courts have generally held that a denial of an insurance claim "is not sufficiently outrageous to state a cause of action for intentional infliction of emotional distress." <u>Coleman v. Republic Indem. Ins. Co. of Cal.</u>, 132 Cal. App. 4th 403, 417 (Cal. Ct. App. 2005).  As Plaintiff points out, there are exceptional cases where courts have allowed IIED claims to proceed

in the insurance context. Opp'n at 18 (citing Unruh v. Truck Ins. Exch., 7 Cal. 3d 616 (Cal. 1972); Fletcher v. W. Nat'l Life Ins. Co., 10 Cal. App. 3d 376 (Cal. Ct. App. 1970)). But the facts of those cases are far different from the facts of the instant action. For example, in Unruh, an investigator hired by the insurer befriended the plaintiff, who had injured her back, and then forced her to engage in activities that aggravated her injury for the purpose of taking surveillance photos. 7 Cal. 3d at 621. In Fletcher, the insurer attempted to induce the plaintiff to "enter into a disadvantageous 'settlement' of a nonexistent dispute by means of false and threatening letters and the employment of economic pressure based upon his disab[ility] . . . ." 10 Cal. App. 3d at 392. Nothing remotely resembling this kind of outrageous conduct is alleged here.

Accordingly, the Court GRANTS Defendant's motion for summary judgment with respect to Plaintiff's claim for IIED.

### D. **Punitive Damages**

Punitive damages are available "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294. For the reasons set forth in section IV.A.ii supra, the Court finds that there are triable issues of fact as to whether Plaintiff is entitled to punitive damages.

### V. **CONCLUSION**

For the foregoing reasons, Defendant Standard Insurance Company's motion for summary judgment is GRANTED in part and DENIED in part. Plaintiff Cassuandra Ellena's bad faith claim is

DISMISSED to the extent that it is predicated on the theory that Defendant's definition of disability is contrary to California law, but remains undisturbed in all other respects. Plaintiff's claims for intentional misrepresentation, negligent misrepresentation, and intentional infliction of emotional distress are also DISMISSED. Plaintiff's claim for breach of contract and her prayer for punitive damages remain undisturbed.

IT IS SO ORDERED.

December 10, 2013

UNITED STATES DISTRICT JUDGE