**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CASSAUNDRA ELLENA, | ) | Case No. 12-5401 SC |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING IN PART AND |
| | ) | DENYING IN PART MOTION FOR |
| v. | ) | SUMMARY JUDGMENT |
| | ) | |
| STANDARD INSURANCE COMPANY, et | ) | |
| al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## I.    INTRODUCTION

After her doctors diagnosed her with lupus, Cassaundra Ellena ("Plaintiff") filed a claim for disability benefits with Standard Insurance Company ("Defendant").  This case arises out Defendant's denial of that claim.  Plaintiff's Second Amended Complaint ("2AC"), the operative pleading in this matter, asserts causes of action against Defendant for breach of contract, breach of the covenant of good faith and fair dealing ("bad faith"), intentional misrepresentation, negligent misrepresentation, and intentional infliction of emotional distress ("IIED").[1]  Defendant now moves

---

[1] The 2AC is currently buried in an undifferentiated mass of more than one thousand pages of documents filed in connection with

United States District Court
For the Northern District of California

for summary judgment on all of these causes of action, with the exception of Plaintiff's breach of contract claim.  ECF No. 58 ("MSJ").  Defendant also moves for summary judgment on Plaintiff's prayer for punitive damages.  The motion is fully briefed, ECF Nos. 70 ("Opp'n") (filed under seal), 76 ("Reply"), and appropriate for determination without oral argument per Civil Local Rule 7-1(b). For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

## II.   BACKGROUND

Plaintiff was employed by Sonoma County (the "County") between December 31, 2008 and April 16, 2010.  At the time Plaintiff resigned her position with the County, her title was "Redevelopment Manager" and her job duties included planning and implementing public works projects.  ECF No. 60 ("Eisele Decl.") Exs. 3, 4.  As part of her employment, Plaintiff was covered by a group long-term disability insurance policy issued by Defendant.  ECF No. 60 ("Eisele Decl.") Ex. 1 (the "Policy").  The Policy provides for "own occupation" coverage for the first twenty-four months of disability, and "any occupation" coverage thereafter.  Id. at 596.

Own occupation coverage protects Plaintiff against disability that renders her "unable to perform with reasonable continuity the Material duties of [her] Own Occupation."  Id. at 601.  The Policy defines "own occupation" as:

> [A]ny employment, business, trade, profession, calling or vocation that involves the same general character as the occupation you are regularly performing for

_____

Defendant's notice of removal.  See ECF No. 6 ("Vanna Decl. Part 2 of 4") at 57-83 ("2AC").

**United States District Court**
For the Northern District of California

1  your Employer when Disability begins.  In determining
2  your Own Occupation, we are not limited to looking at
   the way you perform your job for your Employer, but we
3  may also look at the way the occupation is generally
   performed in the national economy.

4  Id.  The Policy defines "material duties" as:

5

6  [T]he essential tasks, functions, and operations, and
   the skills, abilities, knowledge, training and
7  experience, generally required by employers from those
   engaged in a particular occupation that cannot be
8  reasonably modified or omitted.  In no event will we
   consider working an average of more than 40 hours per
9  week to be a Material Duty.

10 Id.[2]

11     Plaintiff applied for own occupation coverage under the Policy

12 a few days after she left her job with the County in April 2010.

13 Eisele Decl. Ex. 2.  Her claim states that she was unable to work

14 due to "Lupus - Systemic Lupus Erythematosus."  Id. at 481.

15 According to medical records submitted in connection with

16 Plaintiff's claim, she had been dealing with lupus since at least

17 2007.  Plaintiff was hospitalized for two days in June 2008 with

18 chest pain, myalgias, and fever.  Eisele Decl. Ex. 9 at 335-36.

19 The treating physician, Dr. Steven Orkand, observed that

20 Plaintiff's condition improved after she began taking a medication

21 known as prednisone.  Id. at 336.

22     After her hospitalization, Plaintiff continued to see a

23 rheumatologist, Dr. Richard Zweig, concerning her condition.  See

24 Eisele Decl. Ex. 12-14.  Plaintiff saw Dr. Zweig at least four

25 times before quitting her job on April 16, 2010: February 13, 2009,

26

27

28 [2] In connection with the instant motion, neither party raises any
   issues regarding the Policy's definition of "any occupation."

3

1   July 10, 2009, August 17, 2009, and April 14, 2010.  <u>Id.</u>  In a

2   progress note concerning Plaintiff's last visit, Dr. Zweig stated:

3

4           [Plaintiff's] attacks of systemic lupus erythematosus
        have been coming more frequently so that she has them
        now more than she doesn't.  She gets fevers, chest

5       pains, shortness of breath, myalgias and arthralgias.
        She thinks they are triggered by stress at work.  She

6       often works 10-12 hour days.  She increases her
        prednisone to 10 to 20 mg for a few days and tapers.

7       She has had no prednisone for the past two weeks and
        says that rest and exercise are just as effective in

8       curtailing her attacks as prednisone is.  She wants to
        go on disability to see if this is a long term

9       solution.  She is not unwilling to take more
        medications, but would prefer not to if she can

10      control her symptoms with rest.

11

12  Eisele Decl. Ex. 14.  On May 5, 2010, Dr. Zweig submitted an

13  attending physician statement in support of Plaintiff's claim for

14  disability benefits, in which he stated that he anticipated

15  Plaintiff could return to work at the end of the year.  Eisele

16  Decl. Ex. 5.

17      Defendant subsequently retained another rheumatologist, Dr.

18  Shirley Ingram, to review Plaintiff's medical records.  Eisele

19  Decl. Ex. 15.  Based on that review, Dr. Ingram concluded that

20  Plaintiff had "mild systemic lupus erythematosus, with several

21  occasions of chest pain attributed to pericarditis . . . , but her

22  symptoms do respond to prednisone."  <u>Id.</u> at 154.  Dr. Ingram also

23  concluded that "it is reasonable that Plaintiff is able to work

24  eight-hour days, 40 hours per week with consistency," and that it

25  was "[Plaintiff's] decision to cease work in hopes she can avoid

26  taking her low-dose routine lupus medication."  <u>Id.</u> at 155.  Dr.

27  Ingram's conclusions remained unchanged after she spoke with Dr.

28  Zweig on July 30, 2010.  Eisele Decl. Ex. 16.

United States District Court
For the Northern District of California

1    Defendant also obtained a vocational review conducted by Laura
2    Willis.  Eisele Decl. ¶ 20.  Willis described the "strength
3    demands" of Plaintiff's job as "sedentary."  Eisele Decl. Ex. 6.
4    According to Willis's report, "[s]edentary work involves sitting
5    most of the time, but may involve walking or standing for brief
6    periods of time."  Id.  Willis concluded that the job required
7    Plaintiff to "exert force to 10 lbs. occasionally, or a negligible
8    amount of force frequently," as well as occasional "fingering"
9    (e.g., typing) and "handling" but did not require "climbing,"
10   "balancing," "stooping," or "kneeling."  Id.  Willis described
11   Plaintiff's position as "project manager."  She described
12   Plaintiff's job duties in a manner that was generally consistent
13   with the job description provided by the County.  Compare id. with
14   Eisele Decl. Ex. 4.  Willis categorized Plaintiff's position as
15   "project director," and listed a number of "alternate job titles,"
16   including "amphibious warfare research officer" and "dental
17   sciences and research officer."  See Eisele Decl. Ex. 6.
18       Defendant denied Plaintiff's claim for disability benefits on
19   August 27, 2010.  Eisele Decl. Ex. 19.  In its denial letter,
20   Defendant explained that Plaintiff's symptoms "ha[d] been
21   controlled with persistent low-dose prednisone," and that
22   Plaintiff's claim that her physician advised that she cease work
23   was inconsistent with information provided by Dr. Zweig.  Id. at
24   33.  Defendant concluded that, although Plaintiff may occasionally
25   have limitations or restrictions when suffering from lupus flares,
26   her symptoms were not of such severity or frequency as to preclude
27   her from performing her sedentary occupation.  Id.
28   ///

United States District Court
For the Northern District of California

Plaintiff appealed the denial.  Though she conceded that most of her job duties were sedentary, Plaintiff claimed that her job required constant typing, and that long hours at a desk aggravated the pain in her neck, fingers, hands, back, and shoulders.  Eisele Decl. Ex. 20.  She complained that Defendant did not consider the non-physical requirements of her position, which created stress and were key triggers to her lupus flares.  Id.  Plaintiff also disputed that her symptoms could be controlled by prednisone, claiming that she would experience the same symptomatic flares, regardless of whether she increased or decreased her dosage or did not take prednisone at all, and that the prednisone contributed to depression and osteoporosis.  Id.  Additionally, Plaintiff claimed that her job duties sometimes included strenuous physical activity, specifically setting up tables, chairs, and PA equipment for bi-monthly meetings.  Id.

In connection with her appeal, Plaintiff submitted a letter from Dr. Zweig, dated September 7, 2010, stating that Plaintiff's pain attacks were now occurring monthly and showing no signs of abating.  Eisele Decl. Ex. 21.  Dr. Zweig predicted that those attacks were now permanent.  Id.  Plaintiff also submitted a letter from another rheumatologist, Dr. Thomas H. Garrett.  Eisele Decl. Ex. 24.  After reviewing Plaintiff's symptoms and her job duties, Dr. Garrett concluded that Plaintiff was permanently unable to fulfill her current job duties.  Id.

In evaluating Plaintiff's appeal, Defendant hired another physician, Dr. Theodore Kleikamp, to review Plaintiff's medical records.  Eisele Decl. Ex. 27.  Dr. Kleikamp concluded that, notwithstanding Plaintiff's reports of physical discomfort, her

United States District Court
For the Northern District of California

physical exam findings and laboratory work did not indicate lupus of sufficient severity to preclude her from full-time sedentary work.  Id. at 110.  He also stated that Plaintiff had shown improvement from the use of prednisone and that other medications were available to treat Plaintiff's symptoms.  Id.

Defendant also retained another vocational manager, Steve Cooper, to review Plaintiff's file in connection with her appeal. Eisele Decl. Ex. 28.  Cooper stated it was possible that Plaintiff's job involved setting up tables, chairs, and equipment, and that it was not uncommon for directors at her level to be involved in such physical work, but that these tasks were not part of her written job description and were not material duties of her occupation.  Id.  Based on his vocational research and on Plaintiff's job description, Cooper also opined that Plaintiff's position did not required constant typing.  Id.

After reviewing this and other information, Defendant upheld its denial of benefits on November 18, 2010.  Eisele Decl. Ex. 29. Defendant subsequently reviewed another memo from Dr. Garrett, opining that that Plaintiff's elevated ESR[3] results demonstrated significant inflammation, and that this and other new information indicated that Plaintiff was permanently incapacitated.  Eisele Decl. Ex. 30.  Defendant also consulted Bradley Fancher, a doctor of internal medicine, who disagreed with Dr. Garrett's characterization of the ESR result.  Eisele Decl. Ex. 30.  After reviewing this information, Defendant again stood by its decision. Eisele Decl. Ex. 37.

---

[3] ESR stands for "erythrocyte sedimentation rate," a measure of inflammation in the body.

Plaintiff filed this action in state court in November 2011. ECF No. 1.  After non-diverse parties were dismissed from the case, Defendant removed to federal court.  Id.  In here SAC, Plaintiff asserts causes of action against Defendant for (1) breach of contract, (2) bad faith, (3) intentional misrepresentation, (4) negligent misrepresentation, and (5) IIED.  Defendant now moves for summary judgment on claims two through five.

**III. <u>LEGAL STANDARD</u>**

Entry of summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment should be granted if the evidence would require a directed verdict for the moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251 (1986).  "A moving party without the ultimate burden of persuasion at trial -- usually, but not always, a defendant -- has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment."  <u>Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1102 (9th Cir. 2000).

"In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  Id.  "In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact."  Id.

8

**United States District Court**
For the Northern District of California

1   **IV.   DISCUSSION**

2         **A.   Evidentiary Issues**

3         In connection with it motion for summary judgment, Defendant

4   has submitted a number of documents that were not available to or

5   reviewed by Defendant before it rendered a decision on Plaintiff's

6   claim for disability benefits.   See, e.g., ECF No. 59 ("Vana

7   Decl.") Exs. 2-9.  Plaintiff objects to this evidence.   That

8   objection is SUSTAINED.  As discussed below, to succeed on its

9   claim for bad faith, Plaintiff must show that Defendant's denial of

10  her claim for disability benefits was unreasonable.   See Adams v.

11  Allstate Ins. Co., 187 F. Supp. 2d 1207, 1214 (C.D. Cal. 2002).  In

12  assessing reasonableness, the insurer's decisions are considered at

13  the time they were made, "not with the benefit of hindsight."   Id.

14  Thus, any new information that came to light after Defendant

15  decided to deny Plaintiff's claim is irrelevant to the

16  reasonableness of Defendant's decision.   In any event, the

17  objectionable evidence would not change the Court's determination

18  regarding summary adjudication of Plaintiff's claims.

19        Some of the evidence relied on by Plaintiff is also

20  inadmissible.  For example, Plaintiff's opposition brief cites

21  heavily from the declaration of Steven Prater, a purported

22  insurance expert, which offers a series of legal conclusions

23  concerning Defendant's conduct.  At one point, Prater goes so far

24  as to argue that Defendant's definition of "disability" is contrary

25  to cases decided by the California Supreme Court and Court of

26  Appeal.  These opinions clearly violate the prohibition on expert

27  witnesses offering legal conclusions, Elsayed Mukhtar v. Cal. State

28  Univ., 299 F.3d 1053, 1064 n.8 (9th Cir. 2002), and the Court does

not rely on them.

The parties raise a number of other objections concerning evidence that the Court need not consider in adjudicating the instant motion.  Accordingly, the Court declines to rule on those objections.

**B.   Bad Faith**

To prevail on a claim for bad faith in the insurance context, the insured must show that the insurer erroneously failed to pay benefits under an insurance policy, and that failure to do so was without proper cause.  Id.  "[T]he ultimate test of [bad faith] liability in [insurance] cases is whether the [insurer's] refusal to pay policy benefits was unreasonable."  Austero v. Nat'l Cas. Co., 84 Cal. App. 3d 1, 32 (Cal. Ct. App. 1978) overruled on other grounds by Egan v. Mut. of Omaha Ins. Co., 24 Cal. 3d 809, 620 (Cal. 1979).

Plaintiff asserts that Defendant's decision to deny her claim was unreasonable for two reasons: (1) Defendant's definition of disability is contrary to California law; (2) Defendant failed to properly consider the severity of Plaintiff's condition, the demands of her own occupation, and the statements of her treating physicians.  Defendant argues that the first theory fails because the Policy definitions are consistent with California law, and that the second theory fails because there is a genuine dispute concerning Plaintiff's condition.  The Court considers each theory below.

**i.   Definition of Disability**

Plaintiff argues that the Policy's definition of "own occupation" disability is contrary to California law, specifically

1  <u>Erreca v. Western States Life Insurance Company</u>, 19 Cal. 2d 388

2  (Cal. 1942), and <u>Moore v. American United Life Insurance Company</u>,

3  150 Cal. App. 3d 610 (Cal. Ct. App. 1984).  Opp'n at 10.  The

4  Policy defines "own occupation" to mean any employment that

5  involves material duties of the same general character as

6  Plaintiff's own occupation at the time of her alleged disability.

7  Plaintiff contends this definition is a blatant violation of

8  California law, since Defendant should be limited to considering

9  whether she can perform the substantial and material acts necessary

10 to pursue her usual occupation in the usual or customary way.  <u>Id.</u>

11 at 8.

12      As Plaintiff points out, there is a distinction between "own

13 occupation" coverage, which indemnifies against disability that

14 renders an insured unable to perform his or her own occupation, and

15 "any occupation" coverage, which indemnifies against disability

16 that renders the insured unable to perform any occupation.  The

17 instant dispute concerns the former type of coverage, sometimes

18 referred to as "occupational coverage," which is broader and

19 generally more expensive.

20      The case law cited by Plaintiff deals with the latter type of

21 coverage, sometimes referred to as non-occupational coverage.  The

22 policy at issue in <u>Erreca</u> only provided coverage upon a "total

23 disability" that prevented the insured "from engaging in <u>any</u>

24 occupation, or performing <u>any</u> work whatsoever for remuneration or

25 profit."  <u>Id.</u> at 395 (emphasis added).  Nevertheless, the court

26 found that the insured, who was employed as a farm supervisor prior

27 to his disability, was totally disabled under the policy if "he

28 [was] no longer able to pursue the occupation of farmer or farm

United States District Court
For the Northern District of California

1  supervisor."  Id.  The court reasoned that the insured "had little

2  formal education and is neither trained nor qualified for any other

3  occupation.  And because of his age and experience in life, he

4  probably could not prepare himself for other remunerative

5  employment."  Id.  The court then stated: "[T]he term 'total

6  disability' does not signify an absolute state of helplessness but

7  means such a disability as renders the insured unable to perform

8  the substantial and material acts necessary to the prosecution of a

9  business or occupation in the usual or customary way."  Id. at 396.

10      In Moore, the court found that an insurer had run afoul of

11 Erreca by drafting its definition of "total disability" too

12 narrowly.  150 Cal. App. 3d at 620.  Like Erreca, Moore dealt with

13 non-occupational coverage.  Id.  The court upheld the trial court's

14 jury instruction on the definition of total disability, which

15 tracked the language from Erreca, rather than the policy language.

16 Id. at 632-33.  The court also declined to set aside the jury's

17 punitive damage award, reasoning that "lay persons would be

18 unlikely to know that they had an established right under

19 California law to have coverage determined using the broader Erreca

20 standard rather than the explicit language of defendant's policy."

21 Id. at 637-38.

22      Together, Erreca and Moore clearly establish a floor for non-

23 occupational coverage in California and require courts to deviate

24 from the policy language when insurers define "total disability"

25 too narrowly.  Plaintiff argues that these cases also clearly

26 establish a separate, higher floor for occupational coverage, and

27 that Defendant should be held liable for bad faith because the

28 Policy falls below that floor.  Specifically, Plaintiff argues that

1   <u>Moore</u> and <u>Erreca</u> mandate that, for the purposes of occupational

2   coverage, disability must be defined as "disability that renders

3   one unable to perform with reasonable continuity the substantial

4   and material acts necessary to pursue his usual occupation in the

5   usual or customary way."  Opp'n at 8 (quoting <u>Moore</u>, 150 Cal. App.

6   at 631).

7       There are at least two problems with this line of argument.

8   First, California law does not require insurers to quote the exact

9   language from <u>Erreca</u> and <u>Moore</u> when defining disability.  <u>See</u>

10  <u>Hangarter v. Provident Life & Acc. Ins. Co.</u>, 373 F.3d 998, 1007

11  (9th Cir. 2004) ("[F]or all practical purposes there is no

12  difference between <u>Erreca</u>'s use of the phrase 'substantial and

13  material duties' and the policy's use of the phrase 'important

14  duties.").  Rather, it is the insurer's application of the

15  definition that matters.  Here, Plaintiff argues that Defendant

16  used its definition of disability to "hypothesize a fictional,

17  generic occupation for [Plaintiff]."  Opp'n at 11.  But the

18  evidence cited by Plaintiff does not bear this out.  The job

19  description contained in Defendant's vocational report is generally

20  consistent with Plaintiff's professional duties with the County.

21  Plaintiff makes much of the fact that Defendant's vocational report

22  identifies Plaintiff as a "project director" and lists alternative

23  job titles, such as "amphibious warfare research officer," which

24  bear little resemblance to Plaintiff's actual job.  <u>Id.</u>  However,

25  Plaintiff has presented no evidence that Defendant evaluated her

26  claim based on this list of alternative job titles.  Further, it is

27  unclear what these alternative job titles actually represent.

28  ///

United States District Court
For the Northern District of California

The second problem with Plaintiff's theory is that the case law dealing with the definition of "own occupation" disability does not expressly preclude the language used by Defendant.  Erreca and Moore do not directly address the issue because they dealt with non-occupational coverage.  Other California cases have found that Erreca's definition of total disability applies to both occupational and non-occupational coverage.  See Austero, 84 Cal. App. 3d at 20; see also Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1006 (9th Cir. 2004) (citing Austero).  However, none of these courts addressed the policy language at issue in this case, which ostensibly allows the insurer to consider the insured's ability to perform other employment that involves the same general character as the occupation of the insured, and thus these courts did not have an opportunity to declare that such language runs afoul of Erreca.  For example, the policy at issue in Hangarter defined total disability to mean that the insured was unable to perform the "important duties of your Occupation."  373 F.3d at 1006.  Similarly, the policy in Austero defined total disability in the context of a disability that "prevent[ed] the Member from performing any and every duty pertaining to his occupation or profession."  84 Cal. App. 3d at 5.  Absent some clear statement from the California courts that Defendant's definition is wrong, the Court cannot find that Defendant's use of that definition constitutes bad faith.  See Filippo Indus., Inc. v. Sun Ins. Co. of New York, 74 Cal. App. 4th 1429, 1438-39 (Cal. Ct. App. 1999) (courts may not impose bad faith liability where there is a genuine issue as to the insurer's underlying liability created by uncertainties in the case law).

14

**United States District Court**
For the Northern District of California

1    Accordingly, the Court renders summary adjudication in favor

2  of Defendant on Plaintiff's bad faith claim to the extent that the

3  claim is predicated on the theory that Defendant's definition of

4  "own occupation" runs contrary to California law.  Nothing in this

5  Order precludes Plaintiff from asserting a definition disability

6  that departs from the language of the Policy in the context of

7  Plaintiff's breach of contract claim.

8              **ii.  <u>Genuine Dispute Doctrine</u>**

9    Defendant argues that the remainder of Plaintiff's bad faith

10 claim should be dismissed under California's genuine dispute

11 doctrine.  Under this doctrine, an insurer that denies payment of

12 benefits "due to the existence of a genuine dispute with its

13 insured as to the existence of coverage liability or the amount of

14 the insured's coverage claim is not liable in bad faith even though

15 it might be liable for breach of contract."  <u>Bosetti v. U.S. Life</u>

16 <u>Ins. Co.</u>, 175 Cal. App. 4th 1208, 1237 (Cal. Ct. App. 2009)

17 (quotations omitted).  Thus, the doctrine allows an insurer to

18 obtain summary adjudication on an insured's bad faith claim where

19 there is a genuine dispute over coverage.  <u>Id.</u>  "An insurer cannot

20 claim the benefit of the genuine dispute doctrine based on an

21 investigation or evaluation of the insured's claim that is not

22 full, fair and thorough."  <u>Id.</u>  "Nor may an insurer 'insulate

23 itself from liability for bad faith conduct by the simple expedient

24 of hiring an expert for the purpose of manufacturing a genuine

25 dispute.'"  <u>Id.</u> (quoting <u>Chateau Chamberay Homeowners Ass'n v.</u>

26 <u>Assoc. Int'l Ins. Co.</u>, 90 Cal. App. 4th 335, 349 (Cal. Ct. App.

27 2001)).

28 ///

United States District Court
For the Northern District of California

1    The Court finds that there exist several triable issues of

2  fact as to whether there was a genuine dispute concerning

3  Plaintiff's entitlement to disability benefits.  For example, there

4  are triable issues of fact as to whether Defendant gave sufficient

5  weight to the opinions of Plaintiff's treating physicians, whether

6  Defendant placed too much weight on the opinions of doctors that it

7  hired and paid to review Plaintiff's medical records, whether

8  Defendant unreasonably downplayed Plaintiff's reports of her own

9  symptoms, whether Defendant's consideration of the efficacy and

10  side-effects of prednisone was reasonable, whether Defendant

11  properly considered the cognitive and other non-physical demands of

12  Plaintiff's occupation, and whether Defendant's properly assessed

13  the material duties of Plaintiff's own occupation.  All of these

14  issues depend on credibility determinations which the Court cannot

15  make on a motion for summary judgment.

16    Accordingly, the Court declines to find, as a matter of law,

17  that there is a genuine dispute concerning Plaintiff's eligibility

18  for benefits.

19    **B.    Intentional and Negligent Misrepresentation**

20    Plaintiff's claims for intentional and negligent

21  misrepresentation are predicated on the novel theory that Defendant

22  deceived the County into purchasing the Policy by falsely

23  representing that (1) the Policy complied with California law, and

24  (2) Defendant would pay disability benefits if an insured was

25  unable to perform his or her own occupation.  SAC ¶¶ 20-29.

26    Under California law, the elements of intentional

27  misrepresentation, also known as fraud, are: "(1) a

28  misrepresentation (false representation, concealment, or

nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." <u>Robinson Helicopter Co., Inc. v. Dana Corp.</u>, 34 Cal. 4th 979, 990 (Cal. 2004).  The elements of negligent misrepresentation are the same, except that they do not include scienter or intent to defraud.  <u>Small v. Fritz Cos., Inc.</u>, 30 Cal. 4th 167, 173 (Cal. 2003).  Instead, the plaintiff must show that the defendant made a misrepresentation "without any reasonable ground for believing it to be true." <u>Cont'l Airlines, Inc. v. McDonnell Douglas Corp.</u>, 216 Cal. App. 3d 388, 402 (Cal. Ct. App. 1989).

Plaintiff's misrepresentation claims fail for a number of reasons.  To the extent that Plaintiff can actually bring an action based on misrepresentations made to the County, she has offered no evidence showing that the County's reliance was reasonable.  There is no indication that the County was unaware of the terms of the Policy when it agreed to purchase it.  Thus, if the Policy is contrary to California law, the County could have discovered the problem through reasonable diligence.  Likewise, if the County had wanted a narrower definition of "own occupation," it could have insisted on such a definition during negations with Defendant.[4] Plaintiff's claims fail for the additional reason that Plaintiff has failed to offer any evidence of scienter, or evidence that Defendant had no ground to believe its representations concerning

_____

[4] Plaintiff argues that Defendant's promotional materials fail to disclose that the Policy violates California law.  Opp'n at 27 (citing Cohen Decl. Ex. N (filed under seal)).  However, there is no indication that these promotional materials were the only information conveyed to the County prior to its agreement with Defendant.

**United States District Court**
For the Northern District of California

1  the Policy were true.  As discussed in Section IV.A.i <u>supra</u>, the

2  law on own occupation disability insurance is not settled, and thus

3  Defendant could have reasonably believed that the Policy complied

4  with California law.  Further, Plaintiff has offered no evidence

5  that Defendant knew how it would apply the Policy's definition of

6  disability at the time of its agreement with the County.

7      Accordingly, the Court GRANTS Defendant's motion for summary

8  judgment with respect to Plaintiff's claims for intentional and

9  negligent misrepresentation.

10  **C.   <u>IIED</u>**

11      To state a claim for intentional infliction of emotional

12  distress ("IIED"), Plaintiff must allege: "(1) extreme and

13  outrageous conduct by the defendant with the intention of causing,

14  or reckless disregard of the probability of causing, emotional

15  distress; (2) the plaintiff's suffering severe or extreme emotional

16  distress; and (3) actual and proximate causation of the emotional

17  distress by the defendant's outrageous conduct." <u>Christensen v.</u>

18  <u>Super. Ct.</u>, 54 Cal. 3d 868, 903 (Cal. 1991) (quotations and

19  citations omitted).  Conduct is only "extreme and outrageous" when

20  it is "so extreme as to exceed all bounds of that usually tolerated

21  in a civilized community." <u>Davidson v. City of Westminster</u>, 32

22  Cal. 3d 197, 185 (Cal. 1982).

23      California courts have generally held that a denial of an

24  insurance claim "is not sufficiently outrageous to state a cause of

25  action for intentional infliction of emotional distress." <u>Coleman</u>

26  <u>v. Republic Indem. Ins. Co. of Cal.</u>, 132 Cal. App. 4th 403, 417

27  (Cal. Ct. App. 2005).  As Plaintiff points out, there are

28  exceptional cases where courts have allowed IIED claims to proceed

in the insurance context.  Opp'n at 18 (citing Unruh v. Truck Ins. Exch., 7 Cal. 3d 616 (Cal. 1972); Fletcher v. W. Nat'l Life Ins. Co., 10 Cal. App. 3d 376 (Cal. Ct. App. 1970)).  But the facts of those cases are far different from the facts of the instant action.  For example, in Unruh, an investigator hired by the insurer befriended the plaintiff, who had injured her back, and then forced her to engage in activities that aggravated her injury for the purpose of taking surveillance photos.  7 Cal. 3d at 621.  In Fletcher, the insurer attempted to induce the plaintiff to "enter into a disadvantageous 'settlement' of a nonexistent dispute by means of false and threatening letters and the employment of economic pressure based upon his disab[ility] . . . ."  10 Cal. App. 3d at 392.  Nothing remotely resembling this kind of outrageous conduct is alleged here.

Accordingly, the Court GRANTS Defendant's motion for summary judgment with respect to Plaintiff's claim for IIED.

**D.   Punitive Damages**

Punitive damages are available "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  Cal. Civ. Code § 3294.  For the reasons set forth in section IV.A.ii supra, the Court finds that there are triable issues of fact as to whether Plaintiff is entitled to punitive damages.

**V.   CONCLUSION**

For the foregoing reasons, Defendant Standard Insurance Company's motion for summary judgment is GRANTED in part and DENIED in part.  Plaintiff Cassuandra Ellena's bad faith claim is

United States District Court
For the Northern District of California

1   DISMISSED to the extent that it is predicated on the theory that

2   Defendant's definition of disability is contrary to California law,

3   but remains undisturbed in all other respects.  Plaintiff's claims

4   for intentional misrepresentation, negligent misrepresentation, and

5   intentional infliction of emotional distress are also DISMISSED.

6   Plaintiff's claim for breach of contract and her prayer for

7   punitive damages remain undisturbed.

8

9       IT IS SO ORDERED.

10

11      December 10, 2013

12                           UNITED STATES DISTRICT JUDGE